IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICHARD SNYDER,                                    :
                                                   :
            Plaintiff,                             :
                                                   :      C.A. No. 07-00066 GMS
      v.                                           :
                                                   :
GPM2, LLC, CHRISTY MANAGEMENT, LLC,                :
BONNIE BENSON, P.A., THE FELTON BANK               :
OF DELAWARE, JAMES P. CONNOR, JR.,                 :
UNKNOWN TITLE INSURANCE COMPANY                    :
and SERGOVIC & ELLIS, P.A.,                        :
                                                   :
            Defendants.                            :

**OPENING BRIEF OF CHRISTY MANAGEMENT LLC
IN SUPPORT OF ITS MOTION TO DISMISS**

**MORRIS JAMES LLP**

John H. Newcomer, Jr. (I.D. # 2323)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6975
Attorneys for Defendant
Christy Management, LLC

March 29, 2007

# TABLE CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE
PROCEEDINGS.................................................................................................................1

SUMMARY OF ARGUMENT ........................................................................................2

STATEMENT OF FACTS ...............................................................................................3

ARGUMENT.....................................................................................................................4

I.     THE COURT LACKS SUBJECT MATTER JURISDICTION
      OVER PLAINTIFF'S CLAIMS.................................................................................4

II.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM
      UPON WHICH RELIEF CAN BE GRANTED.......................................................5

CONCLUSION..................................................................................................................6

## TABLE AUTHORITIES

**Page**

**Cases**

*Caterpillar, Inc. v. Lewis,*
    519 U.S. 61 (1996)    5

*Lewis v. United Air Lines, Inc.,*
    117 F.Supp.2d 434 (D. N.J. 2000)    4

*Smith v. Delaware First Federal Credit Union,*
    395 F.Supp.2d 127(D. Del. 2005)    4

*UD Technology Corp. v. Phenomenex, Inc.,*
    2007 WL 28295 (D. Del. 2007)    4

**Statutes**

28 U.S.C. § 1331    4

28 U.S.C. § 1332    4

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed his Complaint on February 2, 2007. Plaintiff's Complaint does not set forth the alleged basis for subject matter jurisdiction before this Court. As set forth more fully below, subject matter jurisdiction over this matter does not exist.

On March 29, 2007, Christy Management, LLC ("Christy") filed its Motion to Dismiss pursuant to Federal Rule of Civil Procedure (hereinafter "Rule") 12 (b)(1) and 12(b)(6). This is Christy's Opening Brief in support of its motion.

## SUMMARY OF ARGUMENT

1.      This Court lacks subject matter jurisdiction over the claims asserted by plaintiff.   There is no federal question involved in this case.   Nor is there complete diversity of citizenship between plaintiff and the defendants.   Accordingly, this action must be dismissed.

2.      Plaintiff's complaint fails to state a claim upon which relief can be granted.  Plaintiff's claims are based upon a contract to purchase real estate, as alleged in Paragraph 2 of the Complaint.  The contract provides that time is of the essence, and the plaintiff did not close the transaction by the settlement date set forth therein.  Moreover, plaintiff's counsel sent a letter to the seller under the contract acknowledging that plaintiff had terminated the contract.  Therefore, there is no claim to be asserted under the contract, so that this action must be dismissed.

## STATEMENT OF FACTS

Plaintiff alleges that he had a "contract to by (sic) certain real property in Delaware (dated 25 October 2005)" and that he recorded that contract in the land records of Sussex County on August 22, 2006. (Complaint, ¶ 2, D.I. 1).

The referenced contract, which is attached hereto as Exhibit A, was entered into between plaintiff, as buyer, and defendant GPM2, LLC ("GPM2"), as seller. Section 3.02 of the contract provides that closing shall occur "on or before December 5, 2005," with "time being of the essence."

Plaintiff did not record the contract until August 22, 2006, which indicated that closing under the contract did not occur by December 5, 2005. Moreover, plaintiff's former counsel, John Sergovic, whose firm is a defendant in this action, confirmed in a letter to GPM2 dated February 6, 2006, that plaintiff had terminated the contract and sought the return of his deposit:

> Accordingly, our client has declared the Contract terminated and has requested that we refund the $25,000 deposit currently held by us in escrow.

(Exhibit B).[1]

Plaintiff acknowledges that the contract terminated, because he requests "reinstatement of his original contract" in Paragraph 9 of the Complaint.

Based on a terminated contract, the plaintiff asks the Court to order specific performance or damages.

---

[1] Paragraph 8 of the Complaint alleges that Mr. Sergovic's firm, Sergovic & Ellis, P.A., "originally was to handle the settlement between plaintiff as buyer and defendant [GPM2] as seller."

**ARGUMENT**

I.    **THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS**

Federal courts are courts of limited jurisdiction, and "the party asserting the existence of subject matter jurisdiction bears the burden of proof when contesting a Rule 12(b)(1) motion." *UD Technology Corp. v. Phenomenex, Inc.*, 2007 WL 28295 (D. Del. 2007).

The Complaint does not allege any basis for federal jurisdiction over this matter.[2] There is no federal question involved. 28 U.S.C. § 1331. Plaintiff's claims merely assert an alleged breach of contract. Such claims do not implicate the "Constitution, laws or treatises of the United States." *Smith v. Delaware First Federal Credit Union,* 395 F.Supp.2d 127, 131 (D. Del. 2005)("Plaintiffs' remaining claims include breach of contract, intentional misrepresentation, and intentional infliction of emotional distress. These claims are all state law claims and do not arise under federal laws or the Constitution.").

Nor is there subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. There are no allegations of any party's citizenship in the Complaint. This alone warrants dismissal of a claim based on § 1332. "In order to state subject matter jurisdiction on the basis of diversity of the parties, the plaintiff must affirmatively plead the citizenship of all parties." *Lewis v. United Air Lines, Inc.,* 117 F.Supp.2d 434, 442 (D. N.J. 2000). Moreover, plaintiff identifies his address at the end of the Complaint as Rehoboth, Delaware. Christy is a Delaware limited liability company. (See Exhibit C). Regardless of the citizenship of the remaining defendants, complete diversity in this

---

[2] The Case Summary and Docket sheets for this case indicate that the claimed basis of this Court's jurisdiction is a federal question involving breach of contract.

4

matter, as required by § 1332, is lacking. *Caterpillar, Inc. v. Lewis,* 519 U.S. 61, 68 (1996) (noting that § 1332 "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant.").

Based on the lack of subject matter jurisdiction over plaintiff's claims, the Complaint must be dismissed.

## II.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Even if subject matter jurisdiction existed over plaintiff's claims, the Complaint must still be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Plaintiff's entire case is premised upon the existence of a "contract to by (sic) certain real property in Delaware .... (Complaint, ¶ 2, D.I. 1).  Plaintiff concedes, however, that the contract was terminated, in that he requests "reinstatement of his original contract" in Paragraph 9 of the Complaint.  Closing under the contract did not occur by December 5, 2005, the date set for settlement in the contract. (Exhibit A). Finally, plaintiff's own attorney sent a letter to the seller indicating that plaintiff "has declared the Contract terminated and has requested ... [the] refund of the $25,000 deposit currently held ... in escrow." (Exhibit B).

Having declared the contract terminated, and acknowledging in his Complaint that the contract no longer exists, plaintiff fails to state a claim upon which relief can be granted.  Accordingly, his Complaint must be dismissed.

5

## CONCLUSION

The lack of subject matter jurisdiction dictates that this action be dismissed. Even if subject matter jurisdiction existed in this case, the Complaint fails to state a claim upon which relief can be granted. Therefore, this action must be dismissed.

MORRIS JAMES LLP

_/s/ John H. Newcomer, Jr._____
John H. Newcomer, Jr. (I.D. # 2323)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6975
Attorneys for Defendant
Christy Management, LLC

March 29, 2007

1544788/1

42916   *1 — 85 — 15.13 — 16.* 03350 2005

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made on October 25, 2005, by and between GPM2, L.L.C., a Delaware limited liability company ("Seller") and RICHARD E. SNYDER, or assigns ("Buyer").

## RECITALS

Seller owns certain real property in the Georgetown Hundred, Sussex County and the State of Delaware, lying on the north side of County Road #18, and being commonly known as 503 East Market Street, Georgetown, Delaware, together with all rights and appurtenances thereto, as more particularly described on Exhibit A hereto (the "Property"). Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title and interest in and to the Property, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer covenant and agree as follows:

### ARTICLE ONE: Purchase and Sale of Assets

1.01   Purchase and Sale of Assets.  Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, all of the right, title and interest of Seller in the Property.

1.02   Purchase Price.  In consideration of Seller's sale of the Property to Buyer, Buyer shall pay to Seller an amount equal to Four Hundred Thirty Thousand and 00/100 Dollars ($430,000.00) for the Property and associated improvements (the "Purchase Price").  In consideration of Seller's sale of the Property to Buyer, Buyer shall pay to Seller the Purchase Price in cash at Closing.

1.03.   Manner of Payment.  The Purchase Price shall be paid by Buyer to Seller at Closing in the following manner:

    (a)    Cash Payment.  Buyer shall make a cash payment to Seller at Closing in the amount of Three Hundred Thirty Thousand and 00/100 Dollars ($330,000.00).

    (b)    Promissory Note.  Buyer shall execute and deliver to Seller at Closing a promissory note in a form reasonably acceptable to Seller, which note shall be payable to Seller in the principal amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "Note").  The Note shall be secured by a deed of trust (the "Deed of Trust") on the Property, and shall be in such form as may be reasonably acceptable to Buyer and Seller.

1.04    Bill of Sale/Deed.  At Closing, Seller shall execute and deliver to Buyer: (a) a bill of sale in the form of Exhibit B hereto conveying the Personal Property to Buyer (the "Bill of Sale"), and (b) a general warranty deed in recordable form conveying fee simple title to the Real Estate to Buyer (the "Deed"), free and clear of all liens and encumbrances except (i) real property taxes, and other applicable ad valorem taxes, for the current year pro rated to date of Closing, (ii) the standard exceptions and (iii) matters of record.

1.05    Deposit.  Upon the execution of this Agreement, Buyer shall deliver to Seller its deposit (the "Deposit") in the amount of Twenty-Five Thousand Dollars ($25,000.00), which Deposit shall be applied toward the Purchase Price at Closing (as defined below) or returned to Buyer as provided herein.  No interest will accrue or be earned on the Deposit.

1.06    Risk of Loss.  Seller shall retain all risk of loss or damage to the Assets due to fire, theft or other casualty prior to Closing.  If such loss or damage materially and adversely affects Buyer's intended use and enjoyment of the Assets, Buyer shall have the right to terminate this Agreement by giving Seller written notice thereof, in which event the parties hereto shall have no further obligations or liabilities under this Agreement.

1.07    Broker's Commission.  Seller and Buyer agree that no broker, finder or similar intermediary is entitled to a broker's or finder's fee, commission or other compensation upon the execution of this Agreement, or upon the consummation of the transactions contemplated therein. Each party hereby covenants and agrees to hold harmless and indemnify the other party and its successors and assigns from and against any cause of action, liability, cost or expense made against, or incurred by, such other party as a result, directly or indirectly, of any claim for a broker's or finder's fee, commission or other compensation by any person or entity on the basis of the actions of a party.

## ARTICLE TWO: INSPECTION

2.01    Inspection Period.  The thirty (30) day period beginning upon the execution of this Agreement shall be called the "Inspection Period."  During the Inspection Period, Buyer, its agents, and consultants, at Buyer's sole cost and expense, shall have the right from time to time to enter onto the Property to survey, inspect and conduct engineering, environmental, physical and other investigations of the Property and all records and documents relating to the acquisition, construction, leasing and operation thereof.

2.02    Duty of Care; Indemnity.    Seller hereby consents to Buyer performing such testing as it deems appropriate, and Buyer hereby agrees to restore the Property to its condition prior to such testing. Seller's property manager will cooperate with Buyer in all reasonable respects. Buyer shall enter the Property to conduct its studies at its own risk and shall be responsible for the acts and omissions of and injuries to its agents, contractors, employees and consultants. To that end, Buyer shall at all time carry

*RES*                                    2

commercial general liability insurance concerning such activities and risks and shall carry contractual liability coverage covering its indemnity obligations hereunder. Buyer covenants to indemnify, defend and hold Seller, Seller's partners and its and their employees, principals and other parties claiming by or through them harmless from all loss, damages, claims, liability and costs, including attorneys' fees arising from or incurred as a result of any entry by Buyer, its agents, employees, contractors and consultants into the Property and not caused by the negligence or willful misconduct of Seller or its agents, employees, contractors and consultants.

2.03  Right to Terminate.    Buyer may terminate this Agreement by written notice to Seller prior to the end of the Inspection Period should Purchaser determine in its sole discretion that there are problems that prevent its purchase of the Property. Upon such termination, Seller shall immediately return the Deposit to Purchaser and the parties shall have no further obligation to each other hereunder except as specifically provided herein. If Closing does not occur and this Agreement is terminated, Buyer shall, at Buyer's own expense, promptly repair any damage to the Property caused by Buyer or its agents.

### ARTICLE THREE: Closing and Conditions to Closing

3.01  Actions Prior to Closing.  Prior to Closing, the Seller shall not, without the prior written approval of Buyer, cause or permit the Property to be sold, conveyed, assigned, leased, removed, transferred or otherwise disposed of.

3.02  Closing.  Buyer and Seller shall consummate the purchase and sale of the Assets (the "Closing") at Buyer's attorney's offices or at such other place as the parties may agree upon in writing, on or before December 5, 2005 (the "Closing Date"), time being of the essence. An Event of Default shall occur upon the failure of Buyer to close for any reason other than the termination of this Agreement in accordance with the provisions of this Agreement, or upon the breach or default by Buyer of its obligations, covenants, agreements or representations hereunder. In the event of a default by Buyer with respect to its obligations under this Agreement or under any of the Sale Documents, nothing in this Section 3.02 shall operate or be construed as a waiver by Seller of any right, cause of action or remedy available at law, in equity or under any of this Agreement against Buyer, including, without limitation, specific performance and the recovery of costs and expenses, including attorneys' fees and expenses.

3.03  Deliveries at Closing.

    (a)  Deliveries to Seller.  At Closing, Buyer shall deliver the cash payment to the Seller, together with any other document, instrument or item required to consummate the sale of the Assets in accordance with the terms of this Agreement.

3

(b)    Deliveries to Buyer. At Closing, Seller shall deliver to Buyer the executed Deed and the Bill of Sale and any other document, instrument or item required to consummate the sale of the Assets in accordance with the terms of this Agreement.

3.04    Adjustments. The parties hereto covenant and agree to prorate the taxes, utilities, insurance or other operating expenses of the Store as of Closing. In the event that any such proration is not determined as of Closing, each party covenants and agrees to pay or reimburse the other party upon the presentation of a written invoice with respect to such operating expenses.

3.05    Expenses. Buyer shall pay the cost of obtaining title insurance for the Property and any survey. Each party shall pay its own attorney's fees. Buyer and Seller agree that the costs of all transfer and recordation taxes shall be paid at Closing by Seller and Buyer equally.

3. 05    Disclaimers. Other than those representations and warranties contained in any of the Sale Documents, Seller does hereby disclaim all representations and warranties, expressed or implied, of any kind, nature or type whatsoever with respect to the Assets, including by way of description and not by limitation, those of condition, marketability, merchantability of title, tenantability, habitability, use, suitability and fitness for a particular use, any warranties concerning any of the Assets, the physical condition thereof, including, but not limited to, latent defects and subsurface conditions, the availability, number and size of parking spaces, compliance with all or any laws, ordinances and regulations applicable to the Assets, including, but not limited to, environmental laws, ordinances, rules and regulations and any representations concerning the desirability of the Assets, and the current or projected income or expense of the Assets.

3.06    Seller's Indemnity. Provided that settlement has taken place hereunder, Seller agrees to indemnify and hold harmless Buyer from and against, and to reimburse Buyer with respect to any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses (including attorneys' fees and court costs) asserted against or incurred by Buyer by reason of or arising out of (i)  a breach of any representation or warranty of Seller, and (ii)  the failure of Seller to perform any obligation required by this Agreement to be performed by it.

3.07    Disposition Of Deposit; Remedies.    The Deposit shall be held by Seller and applied to the Purchase Price at Closing if Closing occurs; or (ii) returned to Buyer if Seller defaults or upon failure of a condition hereunder and termination of this Agreement in accordance with the terms hereof, or (iii) returned to Buyer if Buyer notifies Seller prior to the expiration of the Inspection Period that Buyer was not satisfied by the results of its inspections and terminates this Agreement as provided in Section 2.03 of this Agreement. If Buyer defaults in its performance of this Agreement, Seller may terminate this Agreement and retain the Deposit as liquidated damages for Buyer's

4

default.   The parties agree that Seller's actual damages are not susceptible of determination and are highly speculative and that the Deposit is both a reasonable and fair recovery by Seller and is not a penalty or inequitable forfeiture to or by Buyer. If Seller defaults before Closing, Buyer shall be entitled to terminate this Agreement, in which case Buyer shall be entitled to the return of the Deposit as its sole remedy.

3.08.  Like-Kind Exchange.  Buyer agrees that Seller may assign its interest in the Property under this Agreement to a qualified intermediary designated by Seller for the purpose of affecting an exchange for like-kind property under Section 1031 of the Internal Revenue Code of 1986, as amended.  Likewise, Seller agrees that Buyer may assign this Agreement to a qualified intermediary designated by Buyer for the purpose of affecting an exchange for like-kind property under Section 1031 of the Internal Revenue Code of 1986, as amended.  Buyer and Seller shall each cooperate with the other in consummating the exchanges contemplated by this paragraph; provided, however, that neither party shall incur any expense or liability whatsoever in connection with any exchange by the other party other than would have been incurred by such party in a direct purchase as if there had been no exchange.  There shall be no delay in Closing as a result of any exchange.   Neither party shall assume any liability, responsibility or obligation to the other, the Internal Revenue Service or any other person, firm or governmental body or agency in the event all or a portion of the other party's exchange is not tax free.  Buyer and Seller each agree to cooperate with the other's like-kind exchange and, subject to their reasonable approval, to execute any necessary documentation, including without limitation, an Exchange and Escrow Agreement, as is necessary to effect the like-kind exchange.  All costs and expense associated with the like-kind exchange shall be borne solely by the party involved in the exchange.

### ARTICLE FOUR: General Provisions

4.01   Assignment.  Buyer may not assign its rights, obligations or duties under this Agreement without the prior written consent of Seller.

4.02   Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, Seller, Buyer and their respective successors, assigns, personal representatives, executors and administrators.

4.03   Governing Law.  This Agreement shall be interpreted, governed and enforced in accordance with the laws of the State of Delaware.

4.04   Entire Agreement.  This Agreement contains the entire agreement between the parties hereto relating to the purchase and sale of the Assets and supersedes all prior and contemporaneous negotiations, undertakings, and agreements, whether written or oral, between the parties hereto.

5

BK 03350 PG 010

4.05  Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.

4.06  Severability.  If any provision of this Agreement or any of the Sale Documents is held to be unenforceable, illegal or invalid, such provision shall be fully severable, and this Agreement and the Sale Documents shall be construed as if the unenforceable, illegal or invalid provision were never included in this Agreement or in the Sale Documents.

4.07  Notices.  Any notice, request or demand required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed sufficiently given if delivered by hand to the intended recipient, sent prepaid by Federal Express (or a comparable guaranteed overnight delivery service), or deposited with the United States Postal Service (first class mail or registered or certified mail, with return receipt requested, postage prepaid), addressed to the intended recipient, at the intended recipient's address set forth below, or at such other address as the intended recipient may have specified by written notice to the sender given in accordance with the requirements of this Section 3.07.  Any such notice, request or demand so given shall be deemed given on the day it is delivered by hand at the specified address, on the second day after the day of deposit with the United States Postal Service, or on the day after the day of deposit with Federal Express or a comparable delivery service, as the case may be.

For Buyer:                     Richard E. Snyder
                               23 Harbor Road
                               Rehobeth, Delaware 19971

For Seller:                    GPM2, LLC
                               7443 Lee Davis Road, Suite 301
                               Mechanicsville, Virginia 23111
                               Attn: Thomas M. Terry

4.08  Amendment.  This Agreement shall not be amended or modified, and no waiver of any provision hereof shall be effective, unless set forth in a written instrument executed with the same formality as this Agreement.

4.09  Delivery of Additional Documents.  After the date of this Agreement, Buyer shall promptly execute and deliver, without further consideration, such documents as may be requested by Seller or by its employees, agents, insurers or representatives to effectuate, evidence, authorize or approve the transactions contemplated herein.

4.10  No Waiver.  All rights and remedies of Seller available at law, in equity or under the terms of this Agreement, the other Sale Documents or any other agreement or instrument executed in connection herewith shall be cumulative, and no waiver thereof

6

shall be (a) implied from the prior acts or omissions, or based solely upon the oral representations, of Seller, or (b) effective or binding unless, and then only to the extent that, such waiver is set forth in this Agreement or the other Sale Documents or Seller signs an express written waiver of rights or remedies and causes such written waiver to be delivered to Buyer.

4.11  <u>Terms of Convenience</u>.  Captions and headings are used in this Agreement for convenience of reference only and shall not be construed to affect the meaning of this Agreement.  Terms such as "hereof," "herein," "hereto," "hereby," "hereunder," and similar references to this Agreement shall be deemed to refer to this Agreement as a whole and not to any particular section or provision of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GPM2, L.L.C.

By: _____

Title:  _CEO_____

Richard E. Snyder

7

Ξ03ɔɔ0 Ξ012  501-503 Ξ MA. Pat

## EXHIBIT A: THE PROPERTY

PARCEL I:

ALL that certain lot, piece or parcel of land with the improvements thereon erected, situated in Georgetown Hundred, Sussex County and the State of Delaware, lying on the north side of County Road #18, a short distance east of Albury Street, being bounded on the south by County Road #18, on the west and north by lands of D.P. & L. Co., and on the east by lands of Brown Brothers and being more particularly described in accordance with a survey by Earl D. Smith, Professional Land Surveyor, dated December 20, 1993, as follows, to-wit:

BEGINNING at a drill hole in the north line of County Road #18 at a corner for this parcel and for lands of D.P. & L. Co., said point of beginning being a distance of 736.0 feet as measured in an easterly direction from the intersection of the east line of Albury Street with the north line of County Road #18; thence running from said point of beginning with lands of D.P.& L. Co. on the following two courses: (1) North 37 degrees 16 minutes West 108.76 feet to a concrete post; thence (2) North 49 degrees 11 minutes 34 seconds East 257.09 feet to a point at a corner for this parcel and for lands of Brown Brothers; thence running with said lands of Brown Brothers on the following two (2) courses: (1) South 11 degrees 52 minutes 20 seconds West 156.61 feet; thence (2) South 10 degrees 36 minutes 08 seconds East 29.50 feet to point in the north line of County Road #18; thence running with said north line of County Road #18 in a westerly direction with a 2,441.80 foot radius curve to the left, an arc distance of 125.0 feet to the point and place of beginning and containing 0.4896 acres of land be the same more or less.

PARCEL II:

ALL that certain lot, piece or parcel of land with the improvements thereon erected, situated in Georgetown Hundred, Sussex County and the State of Delaware, lying on the north side of County Road #18, a short distance east of Albury Street, being bounded on the south by County Road #18, on the west by lands of Richard and George Brown, on the north by lands of D.P. & L. Co., and on the east by lands of Irvin Robert Green, and being more particularly described in accordance with a survey by Earl D. Smith, Professional Land Surveyor, dated December 20, 1993, as follows, to-wit:

BEGINNING at a point in the north line of County Road #18 at a corner for this parcel and for lands of Richard and George Brown, said point of beginning being the following two (2) courses from the intersection of the east line of Albury Street with the north line of County Road #18: (1) running in an easterly direction with the north line of County Road #18, a distance of 736.0 feet to a drill hole; thence (2) running in an easterly direction with a 2,441.80 foot radius curve to the right, an arc distance of 125.0 feet to the place of beginning; thence running from said point of beginning with lands of

8

BK 03350 PG 013

Richard & George Brown on the following two (2) courses: (1) North 10 degree 36 minutes 08 seconds West 29.50 feet; thence (2) North 11 degrees 52 minutes 20 seconds East 156.61 feet to a point in line of lands of D.P. & L. Co.; thence running with said lands of D.P. & L. Co. on the following two (2) courses: (1) North 49 degrees 11 minutes 34 seconds East 33.24 feet to a found pipe; thence (2) continuing with lands of D.P. & L. Co. and in part with the centerline of a ditch, North 21 degrees 56 minutes 14 seconds East 73.62 feet to a pipe found at a corner for this parcel and of lands of Irvin Robert Green; thence running with said lands of Irvin Robert Green, South 20 degrees 19 minutes 05 seconds East 193.23 feet to a nail found in the north line of County Road #18; thence running with said north line of County Road #18 in a westerly direction with a 2,441.80 foot radius curve to the left, an arc distance of 172.57 feet to the point and place of beginning and containing 0.4608 acres of land be the same more or less.

Prep By: Sergovic & Ellis

Ret to:
   Richard Snyder
   Box 374
   Davidsonville MD
        21035

RECORDER OF DEEDS
        F. BRADY

06 AUG 21  AM 9: 25

SUSSEX COUNTY
DOC. SURCHARGE PAID

**Received**

AUG 2 2 2006

ASSESSMENT DIVISION
OF SUSSEX CTY

9

# SERGOVIC & ELLIS, P.A.
Attorneys at Law
9 North Front Street
P.O. Box 875
Georgetown, Delaware 19947-0875

(302) 855-9500

John A. Sergovic, Jr.
Stephen P. Ellis
Shannon D. Cannean
Brian M. Ellis
Cindy L. Szabo
Bryan W. Blades

Fax (302) 856-2233
E-Mail: jsergovic@seslaw.net

*Registered United States
Patent Office
*Member Maryland & D.C.
Bars Only

Geoffrey R. Myers*
Of Counsel

February 6, 2006

VIA EMAIL AND FIRST CLASS MAIL

(tterry@fasmart.com)

Tom Terry
GPM2, LLC
7443 Lee Davis Road, Suite 301
Mechanicsville, VA 23111

RE:    503 E. Market, LLC - GPM2, LLC

Dear Mr. Terry:

This letter documents that the parties have reached an agreement to disagree as to the terms and provisions of the above-referenced undertaking.

Under the original Contract of Purchase and Sale, the settlement was to occur on December 5, 2005. Seller was not prepared to go to settlement on that date, notwithstanding that it knew that our client intended this sale to complete a 1031 Exchange. Notwithstanding the failure of the Seller to settle on December 5, 2005, settlement was scheduled in our offices on or about January 5, 2006. Immediately prior to the time set for settlement, we were emailed, by GPM2, LLC, its draft version of a Supply Agreement, as well as other documents, which would have been required if the parties had reached an agreement.

On January 5, 2006, I advised that it would take approximately five (5) business days for the undersigned to review the materials emailed to us and proposed for settlement by GPM2, LLC. Thereafter I endeavored to conform the documents prepared by GPM2, LLC to the documents required under the Contract. Significantly, the draft Supply Agreement had many, many terms,

which were never discussed with our client. Neither was a part of the "agreement" as to an ongoing Supply arrangement at these premises, which were integrated into the sale of the real estate portion of the Contract.

One of the key items was GPM2, LLC's insistence that a $25,000 deposit be made by our client in escrow. Our client had never agreed to that; and we so advised. Further, the document you prepared had a maintenance obligation for the underground storage tanks to be undertaken by GPM2, LLC. After proposing that in the draft Supply Agreement, you insisted that to be a typographical error. Needless to say, the parties cannot agree on the terms of the Supply Agreement.

Our client has lost the advantage of closing on this property and obtaining 1031 benefits. Accordingly, we believe that the Contract is terminated for the Seller's failure to perform its obligations under the Contract. Additionally, the parties have failed to reach an agreement as to the terms of the Supply Agreement, which was integrated into the real estate contract.

Accordingly, our client has declared the Contract terminated and has requested that we refund the $25,000 deposit currently held by us in escrow.

If you take a contrary position that the deposit funds are claimed by GPM2, LLC, which we believe has no basis in contract or in fact, we will then interplead the fund; however, in interpleading the fund, we will reserve the right to represent our client, 503 E. Market, LLC, which will seek to secure its interest in the funds submitted in the proposed interpleader.

Thank you for your attention and cooperation.

Sincerely yours,

SERGOVIC & ELLIS, P.A.

John A. Sergovic, Jr.

JAS,JR/clw
cc:     503 E. Market, LLC



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware :    [      ] (GO)    Citizen Services | Business Services | Visitor Info.

**Department of State: Division of Corporations**

---

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions    View Search Results

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 3844914 | Incorporation Date / Formation Date: | 08/19/2004 (mm/dd/yyyy) |
| Entity Name: | CHRISTY MANAGEMENT, LLC | | |
| Entity Kind: | LIMITED LIABILITY COMPANY (LLC) | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | ESTHER CHOUDHARY | | |
| Address: | 2920 N DUPONT HWY | | |
| City: | DOVER | County: | KENT |
| State: | DE | Postal Code: | 19901 |
| Phone: | | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

---

site map | about this site | contact us | translate | delaware.gov

Slip Copy, 2007 WL 28295 (D.Del.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
UD TECHNOLOGY CORPORATION, Plaintiff,
v.
PHENOMENEX, INC., Defendant.
C.A. No. 05-842-GMS.
Jan. 4, 2007.

Michael P. Kelly, McCarter & English, LLP, Wilmington, DE, for Plaintiff.
John W. Shaw, Young, Conaway, Stargatt & Taylor, Chad Michael Shandler, Richards, Layton & Finger, Wilmington, DE, for Defendant.

### MEMORANDUM

GREGORY M. SLEET, United States District Judge.

## I. INTRODUCTION

**\*1** The plaintiff, UD Technology Corporation ("UDTC"), filed the above captioned suit, against Defendants Phenomenex, Inc. ("Phenomenex") and Research Corporation Technologies ("RCT"), alleging patent infringement, breach of contract, violation of the covenant of good faith and fair dealing, misappropriation of trade secrets, violation of the Uniform Deceptive Trade Practices Act, unjust enrichment, and conversion. On July 21, 2006, UDTC filed a stipulation of dismissal, dismissing RCT from the case, with prejudice. (D.I.37.) Presently before the court is Phenomenex's motion to dismiss UDTC's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), and UDTC's motion to amend its complaint. For the reasons set forth below, the court will (1) grant-in-part and deny-in-part Phenomenex's motion to dismiss and (2) grant-in-part and deny-in-part UDTC's motion to amend.

## II. BACKGROUND

In March of 1990, the University of Delaware (the "University") entered into a contract with RCT for "Disclosure, Evaluation and Commercialization of Inventions" (the "DECI"). (D.I.26, Ex. A.) In the DECI contract, the University granted RCT certain rights to market and promote the University's proprietary technologies. *Id.*

In or around 1991, Drs. Mary Wirth and Hafeez O. Fatunmbi were working in the Department of Chemistry and Biochemistry at the University on the study of surface chemistries relating to substrates such as silica beads used in chromatographic processes. (D.I.1, Compl.¶¶ 12, 14.) This work culminated in an application for a patent. (D.I.1, Compl.¶¶ 14-15.) On June 17, 1992, RCT filed U.S. Patent Application No. 900,215 (the "Application") to protect Drs. Wirth and Fatunmbi's research. *Id .*

In August 1992, RCT and Phenomenex entered into the "Materials Treatment Agreement," which allowed Phenomenex to submit certain materials for treatment according to the technology in the Application, and an opportunity to use the treated materials for noncommercial research purposes. (D.I.26, Ex. B.) According to the Materials Treatment Agreement, Drs. Wirth and Fatunmbi (the "Inventors") had assigned the Application to RCT. *Id.*

In March 1993, RCT and Phenomenex entered into the "Evaluation License Agreement," in which RCT granted Phenomenex a license to make and use products, and to practice processes, using the technology in the Application, for evaluation of the "invention" described in the Application. (D.I.26, Ex. C.)

During RCT's ownership of the Application and claimed technology, U.S. Patent No. 5,599,625 ("the '625 patent"), entitled "Products Having Multiple-Substituted Polysiloxane Monolayer," issued to Drs. Wirth and Fatunmbi (the "Inventors"), on February 4, 1997. (D.I.1, Compl.¶ 27.) On August 10, 2001, RCT assigned to the University its "entire right, title and interest" in the '625 patent. (D.I.26, Ex. E.) This assignment was pursuant to an "Agreement

to Assign" between RCT and the University, effective July 24, 2001. *Id.*

***2** Plaintiff UDTC owns and manages intellectual property developed through the University's scientific research and doctorate programs. (D.I.1, Compl.¶ 1.)

### III. STANDARDS OF REVIEW

#### A. Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of a plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) for lack of **subject matter jurisdiction** can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of **subject matter jurisdiction** in fact (factual attack). *Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977). When reviewing a facial attack, the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id.*

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen,* 549 F.2d at 891. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.' " *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir.1987) *(quoting Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 (1974)).

#### B. Rule 12(b)(6) Standard

In ruling on a motion to dismiss for failure to state a claim, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v.. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). Moreover, a court must view all reasonable inferences that may be drawn from the complaint in the light most favorable to the non-moving party. *See Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both *citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

#### C. Motion to Amend Standard

Leave to amend a pleading should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). The court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997).

### IV. DISCUSSION

***3** "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of **subject matter jurisdiction**, all other defenses and objections become moot." *In Re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993), *aff'd* 39 F.3d 61 (3d Cir.1994). Therefore, the court will first turn its attention to the 12(b)(1) motion to dismiss for lack of **subject matter jurisdiction**.

#### A. Patent Infringement (Count I)

UDTC first contends that Phenomenex has infringed and continues to infringe one or more claims of the '625 patent by its offer of sale and sale of certain Phenomenex products, including products marketed under the name Jupiter. (D.I.1, Compl.¶ 28.) Phenomenex argues that UDTC lacks standing to assert a claim for patent infringement arising prior to 2001 because UDTC does not allege that UDTC was transferred the right to sue for past infringement, and its right to sue for post-2001 patent infringement is insufficiently pled.

Standing to sue for infringement has traditionally been confined to those with an ownership interest in the patent at the time of the infringement. *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.1991) ( "The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement."). Where a plaintiff, who is not the inventor, seeks to sue for infringement, both past and present, the plaintiff must have obtained an assignment of the patent, coupled with an assignment of a right of action for past infringements. *Id.* The latter assignment must be express, and cannot be inferred from an assignment of the patent itself. *Id. (citing Moore v. Marsh,* 74 U.S. (7 Wall.) 515, 522 (1868)). Applying these principles to the facts alleged in UDTC's complaint and the contracts available for the court's review, the court concludes that UDTC does not demonstrate standing to sue for any period of infringement of the ' 625 patent.

UDTC's complaint alleges two assignments from the University to UDTC (D.I.1, Compl.¶ 8), but does not identify any time frame or relate such assignments chronologically with an alleged assignment from RCT to the University on July 24, 2001 (D.I.1, Compl.¶ 30). UDTC cites to RCT's Answer to UDTC's original complaint as support for its claim that RCT assigned its rights to the '625 patent and all related contractual interests to the University. (D.I. 26 at 11, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.) UDTC not only argues that RCT admits UDTC's allegation of a complete transfer of rights, but UDTC also points out that RCT asserts no rights under the '625 patent in this action. *Id.* Nevertheless, RCT's Answer to UDTC's complaint bears no weight or relevance as to the propriety and sufficiency of UDTC's complaint against Phenomenex.

**\*4** Even if RCT's Answer was arguably relevant to the issue of the sufficiency of UDTC's complaint, the substance of the cited portion of RCT's Answer does not help UDTC. Indeed, it does nothing more than admit the averments of paragraph 30 of the Complaint. Paragraph 30 alleges that, pursuant to a July 24, 2001 Agreement to Assign, RCT assigned all of its right, title, and interest in and to the '625 Patent and the inventions described therein to the University on August 10, 2001. This "admission" does not address the issue of whether UDTC has the right to sue for past infringement. Likewise, it offers no insight into the question of when or by what instrument UDTC was assigned all of the University's "past, present and/or future right, title and interest in and to the technology and any agreements, causes of action and/or third party beneficiary rights associated with the '625 Patent to UDTC." (D.I .1, Compl.¶ 8.)

### 1. Right to Sue for Past Infringement, Prior to August 10, 2001

In its opposition brief, UDTC cites to *Minco, Inc. v. Combustion Engineering, Inc.*[FN2] for the proposition that "the intent of the parties control." (D.I. 26 at 12, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss.) This assertion, however, misconstrues the holding in *Minco.* The Federal Circuit did indeed affirm the trial court's decision that the plaintiff could recover damages for infringement occurring before the date of the assignment to the plaintiff, but the Federal Circuit did so by analyzing whether *"the assignment agreement manifests an intent"* to transfer the right to sue for prior infringement. *Minco,* 95 F.3d at 1117 (emphasis added). In other words, in *Minco,* the Court of Appeals found clear intent from the words of the assignment itself. *Id.* ("The express reference to past infringement in the MAC assignment expanded the scope of the term 'right, title, and interest' to encompass the right to sue for prior infringement.").

FN2. 95 F.3d 1109, 117 (Fed.Cir.1996).

*Chisum* has aptly summarized a long line of Supreme Court and Federal Circuit cases as holding that if ownership of the patent is transferred, the transferor retains the right to sue for pre-transfer infringements unless that right is expressly relinquished in the transfer. CHISUM § 21.03[2][g][I]. In spite of this well-settled federal law, UDTC urges the court to apply Delaware and Arizona state law regarding the interpretation of contract language to "fix the scope and breadth of [the] assignment ." (D.I. 26 at 12.) Determining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law. *Minco,* 95 F.3d at 1117. The Delaware and Arizona cases to which UDTC directs the court's attention, however, concern contracts with ambiguous terms. None of these cases permit resort to extrinsic evidence for unambiguous

contract language, as in the case here. Further, the court has not found any Arizona or Delaware case law that sanctions the contract interpretation UDTC asks the court to adopt under the facts of this case.

*5 Moreover, the agreements that the court has in its possession and to which the court must confine its analysis, in the absence of any other evidence from UDTC, do not manifest any intent to confer a right to sue for past infringement. In the absence of an express provision to sue for past damages, as is the case here, the court cannot confer standing on UDTC to pursue damages for alleged patent infringement that occurred before it was assigned the '625 patent.

Additionally, UDTC directs the court's attention to the litigation conduct of RCT as a reason to infer a provision not expressed in the assignment. Specifically, UDTC suggests that because RCT did not file a cross-claim, counter-claim, or otherwise assert an affirmative defense, the totality of circumstances indicates that RCT conveyed to the University any rights it had to sue for past infringement. (D.I. 26 at 13.) Simply put, the conduct of third-party RCT in litigation is not evidence from which the court can now conclude that UDTC was assigned a right to sue for past infringement.

The court therefore rejects UDTC's contention that it has sufficiently alleged a right to sue for past infringement. Moreover, the court is left wondering whether UDTC indeed possesses the right to sue for patent infringement alleged to have occurred during any period.

### 2. Right to Sue for Infringement After August 10, 2001 Assignment

The court notes that UDTC does not even attach as an exhibit to its complaint, responsive briefs, or amended complaint, the instrument that purportedly conferred to UDTC the rights to bring this lawsuit. The party asserting the existence of **subject matter jurisdiction** bears the burden of proof when contesting a Rule 12(b)(1) motion. *See, e.g.* Mortensen, 549 F.2d at 891 n. 16 (3d Cir.1977). Here, UDTC states that "[a]t such time as it becomes necessary (because it is not now in the context of a motion to dismiss), UDTC will adequately evidence the assignment from the University to UDTC." (D.I. 26 at 9.) Unfortunately, for UDTC, as the saying goes, there is no time like the present. More specifically, the necessary time was immediately after **subject matter jurisdiction** was challenged, i.e. when UDTC filed its opposition to Phenomenex's motion to dismiss. *See Cedars-Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.1993) ("Once challenged, allegations alone are insufficient to meet the complainant's burden [to support its contention regarding the court's jurisdiction].").

In Phenomenex's Opening Brief in Support of its Motion to Dismiss, Phenomenex states that "UDTC's claims are insufficient as pled and must be dismissed, insofar as UDTC has failed to state claims upon which relief can be granted and improperly alleged **subject matter jurisdiction** for its claim of patent infringement." (D.I. 23 at 1, Def.'s Br. ISO Mot. to Dismiss.) In apparent deference to UDTC's conclusory allegation that the University assigned its rights in the '625 patent to UDTC, Phenomenex appears to retreat from its initial argument as to UDTC's lack of standing to pursue post-2001 patent infringement. *See* Def.'s Reply Br. ISO Mot. to Dismiss (D.I. 32 at 2). The court will not, however, cover Phenomenex's withdrawal. *See Mennen Co. v. Atlantic Mt. Ins. Co.,* 147 F.3d 287 (3d Cir.1998) ("A party may not confer or defeat jurisdiction by mere pleading. **Subject matter jurisdiction** depends upon facts, and *when any question arises as to the existence of jurisdiction, a federal court is obligated to make an independent determination of those facts.*").

*6 Phenomenex has raised a colorable question as to whether this court has jurisdiction to hear UDTC's pre-2001 patent infringement claims. The court agrees with Phenomenex that UDTC cannot pursue its claim for past infringement of the '625 patent before this forum. Fulfilling its obligation to make an independent determination, the court also finds proof of **subject-matter jurisdiction** lacking for UDTC's post-2001 patent infringement claims. The court will, however, give UDTC another opportunity to demonstrate that it has the right to pursue post-2001 infringement claims, as set forth in the accompanying order.

### B. Contract Claims (Counts II-V)[FN3]

FN3. Counts IX-X were also contract-related counts against RCT. Since RCT has been dismissed from this action, the court will not address counts IX-X, as they are moot.

*1. Breach of Contract*

UDTC alleges that Phenomenex has breached the Materials Agreement between RCT and Phenomenex and the Evaluation License Agreement between the same parties. Neither UDTC or the University of Delaware contend they were parties to either contract. Phenomenex argues that UDTC has not pled facts sufficient to confer standing to assert claims for breaches of the Materials Treatment and Evaluation License Agreements. The court agrees.

A fundamental principle of contract law provides that only those entities that are parties to a contract or conferred rights to or under a contract have standing to enforce it. *See Insituform of North America, Inc. v. Chandler*, 534 A.2d 257 (Del. Ch.1987) ("Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party."). *See generally* 2 *Williston on Contracts* § 356 (1959); 4 *Corbin on Contracts* §§ 772, 774 (1951). The developed law has characterized persons who, while not being parties to a contract, nonetheless benefit from its performance in one of three ways: as donee beneficiaries, as creditor beneficiaries, or as incidental beneficiaries. *Restatement of Contracts* § 133 (1932); *see generally* *Restatement of Contracts (Second)* § 302 (1979). Where a contract only incidentally or remotely benefits a third party, but is not expressly made for the benefit of the party, that party cannot recover thereon. *Fobes v. Blue Cross and Blue Shield of Arizona, Inc.*, 861 P.2d 692, 696 (Ariz.Ct.App.1993); *see also* *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit.").

As a threshold matter, the court finds the factual allegations in the complaint facially deficient. *See* Fed.R.Civ.P. 8(a) and 9(f). Rule 8(a) requires a claimant to set forth (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim **showing that the pleader is entitled to relief**, and (3) a demand for judgment for the relief the pleader seeks. Rule 9(f) states: "For the purpose of testing the sufficiency of a pleading, **averments of time and place are material** and shall be considered like all other averments of material matter." [FN4]

> FN4. "Whether or not statements in a pleading of time and place are required is determined by the substantive nature of the suit ... A specific statement of time has been required in numerous types of cases. For example, in pleading claims based on a written contract or promissory note, it usually is necessary to allege the time it was signed ... because this helps identify the document that is the subject matter of the dispute." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1309 (2d ed.1995).

**\*7** Notably, UDTC's complaint fails to specifically allege that it possesses rights to enforce the Materials Treatment and Evaluation License Agreements. The closest averment the court can find within the complaint is the conclusory allegation of paragraph 8, which alleges two unidentified assignments from the University to UDTC. (D .I.1, Compl.¶ 8.) As noted above, however, neither the University nor UDTC are parties to the agreements UDTC is attempting to enforce. Additionally, the alleged assignments of paragraph 8 of the complaint provide no temporal context. That is, the averment does not identify either contract by name or time frame, nor does it relate either assignment contextually and chronologically with an alleged assignment from RCT to the University on August 10, 2001. *See* Compl. ¶ 30. (D.I.1.) Moreover, the alleged assignment from RCT to the University averred in paragraph 30, does not confer an assignment of contractual rights, only prospective ownership rights to the ' 625 patent. *Id.*

In response to Phenomenex's challenge to UDTC's standing, UDTC states that it has alleged "rights to pursue its claims as (i) a party (either as a principal to its agent RCT or directly), (ii) as a disclosed and intended third party beneficiary thereto, and (iii) as previously stated, via total assignment of rights. (D.I.1-Compl.¶¶ 7-8)." (D.I. 26 at 13-14). First, the only contracts the court has in its possession clearly show that UDTC was not a party. Phenomenex correctly points out that UDTC did not plead agency and cannot defeat a motion to dismiss by now advancing the theory that RCT, originally a defendant in this action, was an agent for UDTC.

Second, UDTC did not plead that it was an intended third party beneficiary and the Materials Treatment and Evaluation License Agreements don't disclose it as such.[FN5] Furthermore, the Evaluation License Agreement contains the following language: *"No Third-Party Beneficiaries.* None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any third party." While not as explicit as the Evaluation License Agreement, the Materials Treatment Agreement contains no mention of UDTC and only passively refers to the University of Delaware in further identifying the Inventors of what has become the ' 625 patent. *See* D.I. 26, Ex. B ("Drs. M.J. Wirth and

H.O. Fatunmbi ("INVENTORS") of the University of Delaware have invented a Multiple-Substituted Polysiloxane Monolayer ('INVENTION') as described in U.S. Patent Application No. 900,215, filed 06/17/92 ('APPLICATION')."). This passing reference gives no indication that the University was an intended third party beneficiary. Furthermore, the Materials Treatment Agreement itself states that the Inventors assigned the technology at issue to RCT.

FN5. The court need not engage the purely academic exercise of determining whether, under Arizona or Delaware law, UDTC qualifies as an intended third party beneficiary as it fails to plead third-party beneficiary status.

Finally, UDTC offers no support for its allegation that RCT assigned any contractual rights to the University. Given Phenomenex's subject-matter jurisdictional challenge, UDTC must first establish that RCT assigned both agreements to the University, before it can rely on an alleged assignment of those rights from the University to UDTC. Instead, UDTC alleged that RCT retained contractual rights to "police and monitor all third party use of the Licensed Technology." (D.I.1, Compl.¶ 34.) This allegation formed part of the basis for UDTC's now-dismissed suit against RCT. At the time of the complaint, UDTC claimed that RCT was still responsible for monitoring the Licensed Technology. (D.I.1, Compl.¶ 33) ("Pursuant to the Marketing Agreement, RCT was *and is* responsible for monitoring the Licensed Technology...."). These allegations, which find support in the Marketing Agreement, the July 2001 Agreement to Assign, and the accompanying August 2001 Deed of Assignment, contradict UDTC's argument that it can pursue its contract claims pursuant to "total assignment" of rights. For these reasons, UDTC's breach of contract claims must be dismissed.

### 2. Breach of the Covenant of Good Faith & Fair Dealing

**\*8** The court agrees with Phenomenex's contention that UDTC does not have standing to pursue an alleged breach of the covenant of good faith and fair dealing,. See *Leal v. Allstate Ins. Co.,* 17 P.3d 95, 99 (Ariz.Ct.App.2000) ( "Courts imply a covenant of good faith and fair dealing in every contract. The duty to act in good faith arises by virtue of a contractual relationship. Thus, a third-party claimant, a stranger to the contract, cannot sue the insurer for tortious breach of the duty of good faith."); *Superior Vision Servs. v. Reliastar Life Ins. Co.,* 2006 Del. Ch. LEXIS 160 (Del. Ch., Aug. 25, 2006, Decided) ("[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare."). The court can find no grounds upon which to impose a duty of good faith and fair dealing flowing from Phenomenex to UDTC. In the absence of any evidence demonstrating an assignment of contractual rights to UDTC,[FN6] the court concludes that UDTC's contract-related claims must be dismissed.

FN6. The court acknowledges that Phenomenex has set forth additional grounds for the dismissal of UDTC's contract claims, however, the court has concluded that UDTC lacks standing and therefore, the court will not reach the merits of Phenomenex's additional arguments.

### 3. Misappropriation of Trade Secrets

In Counts IV and V of its complaint, UDTC alleges that Phenomenex willfully misappropriated the University's trade secrets, in violation of Ariz.Rev.Stat. Sec. 44 and 6 Del. C. Sec.2001. According to paragraphs 60 and 68 of its complaint, UDTC predicates its claims of trade secret misappropriation on an agreement between Phenomenex and RCT that allegedly required Phenomenex to keep the University's secrets. (D.I.1, Compl.¶¶ 60, 68.) Where the duty to keep a divulged trade secret arises from a contract, it follows that only those parties to the contract have standing to pursue a claim of trade secret misappropriation based on a breach of that contract. For the reasons previously stated, the court concludes that UDTC does not have standing to pursue contract-based claims against Phenomenex. Therefore, UDTC's trade secret misappropriation claim must be dismissed.

### C. Claims for Violation of the Uniform Deceptive Trade Practices, Unjust Enrichment, and Conversion (Count VI-VIII)

In Count VI of its complaint, UDTC alleges that Phenomenex engaged in conduct designed "to deceive the public to whom Phenomenex markets such that it represents expertise, experience and product design *that are the result of secret misappropriation of the Licensed Technology and the '625 Patent.*" (D.I.1, Compl.¶ 73) (Emphasis added). In Count VII, UDTC alleges that Phenomenex benefited from "Phenomenex's unauthorized use of the

Licensed Technology and '625 Patent." (D.I.1, Compl.¶ 79.) UDTC's allegations of trade secret misappropriation preempt its claims of deceptive trade practices and unjust enrichment. This is so because the latter claims are based expressly upon the alleged misappropriation of trade secrets. The misappropriation is alleged to stem from Phenomenex's alleged use of and benefit from the University's confidential information. *See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1122, 1146 (Fed.Cir.2004); *Ethypharm S.A. v. Bentley Pharm., Inc.,* 388 F.Supp.2d 426, 433 (D.Del.2005) (granting motion to dismiss fraud and unjust enrichment claims as preempted). Since no additional facts, independent of those alleged in support of its trade secret misappropriation claim, have been averred to support these claims, UDTC's deceptive trade practice and unjust enrichment claims are therefore dismissed, as preempted.

**\*9** The eighth count of the complaint alleges conversion. (D.I.1, Compl.¶ 82.) The extent to which UDTC's conversion action is predicated only on the same facts upon which it bases its deceptive trade practice and unjust enrichment claims, the conversion claim is clearly preempted. *Ethypharm,* 388 F.Supp.2d at 433.

It is conceivable that UDTC also presents a claim for conversion of tangible property in addition to its claim of conversion of intellectual property. In its complaint, UDTC refers to "other property" (D.I.1, Compl.¶ 82) ("Phenomenex, by exercising control and dominion over the Licensed Technologies and the '625 Patent and *other property* in an unauthorized manner, systematically and secretly deprived UDTC of its interest in its intellectual property.") (emphasis added). UDTC later defines Licensed Technology to include "other technology, including any trade secrets and/or know how associated therewith, that is encompassed by any of the Marketing Agreement, the Materials Agreement and the Evaluation Agreement, including Licensed products and Licensed Processes as defined in those Agreements." (D.I.1, Compl. ¶ 35.) In its opposition brief, however, UDTC resolves any ambiguity in its conversion claim by stating what it believes to be the elements of its conversion claim: "(i) UDTC has a ***property interest in the confidential information, trade secrets and patents;*** (ii) that UDTC had right to prevent others from using such information, trade secrets and patents; and (iii) that UDTC has sustained damages. *See Facciolo Constr. Co. v. Bank of Del.,* 514 A.2d 413 (Del.1986); *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del. Ch.1988)." (D.I. 26 at 32.) Aside from the fact that UDTC cites the *Facciolo* and *Goodrich* cases, which involve tangible property and do not discuss the interplay between conversion and claims concerning intellectual property, UDTC's listing of the necessary elements of its conversion claim makes no mention of tangible property. Where UDTC makes no claim of conversion of tangible property, the court sees no obligation to preserve this otherwise potentially viable, albeit narrow, subset of its conversion claim.

For at least these reasons, Count VIII of UDTC's complaint for conversion must be dismissed.

### D. Claims for Relief (Count XI-XII)

In Counts XI and XII of its complaint, UDTC does not state a claim for relief, but rather incorporates the allegations of its previous ten claims, and requests additional remedies. In Count XI, UDTC demands that "Phenomenex provide to it an accounting of all past, present and future uses of the Licensed Technology and the '625 Patent and account for all revenues, benefits or otherwise accrued from such use." (D.I. 1, Compl. at 24.) In Count XII, UDTC asks the court to impose a constructive trust for the benefit of UDTC "in an amount to be determined at the time of trial." (D.I. 1, Compl. at 26.) As these counts do not allege any different claims for which relief can be granted, other than claims previously alleged, the court will treat these counts as an additional prayer for relief. Counts XI and XII are therefore dismissed.

### E. Motion to Amend

**\*10** Recognizing that motions to amend shall be granted freely, the court views this motion differently than the typical motion to amend. First, in its terse motion, UDTC states that the reasons for its motion are "in the interest of judicial economy" in light of the fact that the "dismissal [of RCT] made extraneous certain allegations of the Complaint." (D.I. 38, Pl.'s Mot. to Amend at 1.) In its reply brief, UDTC states that its motion to amend the complaint was an effort "to simplify the pleadings for the Court." (D.I. 43, Pl.'s Reply Br. at 1.) The court finds these stated reasons curious in light of UDTC's letter of July 21, 2006 (D.I.39), and the actual proposed amendments to the complaint, which also attempt to bolster the standing deficiencies.[FN7] UDTC's July 21st letter states that the motion to amend and presumably, the proposed amendments, "reflect[s] that UDTC no longer seeks to prosecute such claims [against RCT]." *Id.* While UDTC's proposed amendments do eliminate Counts IX-X against RCT, they also remove contextual background necessary for the standing analysis of the remaining counts, found in paragraphs 16-17 and 33-34 of the original complaint.

FN7. The court is also in receipt of UDTC's May 15, 2006 letter (D.I .36), in which UDTC makes reference to a "Clarification" that would be presented to the court, rendering moot RCT's Motion to Dismiss. According to UDTC, the "Clarification" would be a stipulation that would restate prior assignments and "for the avoidance of any further doubt, assign any such right, title and interest as RCT still may have to UDTC)." To date, the court has not received the aforementioned "Clarification." Even if the court was in receipt of such a "Clarification," the court is not inclined to accept assignments that post-date the civil action upon which the lawsuit relies. "As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day." _Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,_ 93 F.3d 774, 780 (Fed.Cir.1996), _as amended on rehearing,_ 104 F.3d 1296 (Fed.Cir.1996).

Further, UDTC's proposed amendments add substance to the complaint, which would only serve to bolster arguments made in its Opposition to Phenomenex's Motion to Dismiss. For example, UDTC seeks to change paragraph 7 of the original complaint to add that RCT acted "on behalf of" the University instead of "agreed with the" University to market intellectual property. This change would appear to lend support to the later-argued, but not alternatively pled, position that RCT acted as an agent for the University. UDTC also seeks to add a new paragraph asserting that "At all times relevant, University was the owner of the intellectual property at issue herein, including the right to sue for past, present and future infringement, and to pursue contract damages pursuant to the contracts identified herein, between RCT and Phenomenex." (D.I.38, Ex. B.)

Even if the court were to allow these substantive amendments, the amendments would be futile, in that Phenomenex has asserted factual challenges to **subject matter jurisdiction** and UDTC's standing. UDTC's proposed additions are nothing more than conclusory and bald assertions, which the court is not obliged to credit. _See United States v. Vespe,_ 868 F.2d 1328, 1340 (3d Cir.1989) (stating conclusory statements need not be credited).

Insofar as UDTC's amended complaint seeks to make substantive changes that either remove necessary context or add further conclusory allegations regarding ownership or standing, and such amendments do not change the outcome of Phenomenex's motion to dismiss, those amendments are denied. The court will permit UDTC to amend its complaint to remove Counts IX-X.

### ORDER

IT IS HEREBY ORDERED that:

1. Phenomenex's Motion to Dismiss (D.I.22) is GRANTED IN PART and DENIED IN PART.

*11 (a) UDTC's claim for patent infringement alleged to have occurred prior to August 10, 2001, is dismissed.

(b) UDTC's claim for patent infringement alleged to have occurred after August 10, 2001, is conditionally dismissed. The court will grant UDTC leave to provide a more definite statement, including evidence of an assignment from the University of Delaware to UDTC for alleged patent infringement occurring after August 10, 2001, within 30 days of this Order.

(c) Counts II-XII are dismissed.

2. UDTC's Motion to Amend (D.I.38) is GRANTED IN PART and DENIED IN PART.

D.Del.,2007.
UD Technology Corp. v. Phenomenex, Inc.
Slip Copy, 2007 WL 28295 (D.Del.)

Motions, Pleadings and Filings (Back to top)

- 2007 WL 618249 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Reconsider and Amend Paragraph L (A) of the Order of January 4, 2007 (Jan. 19, 2007)
- 2006 WL 1199998 (Trial Motion, Memorandum and Affidavit) Defendant Research Corporation Technologies, Inc.'s Reply Brief in Support of its Motion to Dismiss (Mar. 3, 2006) 🖼 Original Image of this Document (PDF)
- 2006 WL 1199999 (Trial Motion, Memorandum and Affidavit) Defendant Phenomenex, Inc.'s Reply Brief in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State A Claim upon which Relief Can be Granted (Mar. 3, 2006) 🖼 Original Image of this Document (PDF)
- 2006 WL 809230 (Trial Motion, Memorandum and Affidavit) Plaintiff Ud Technology Corporation's Memorandum of Law in Opposition to Phenomenex, Inc.'s Motion to Dismiss (Feb. 21, 2006) 🖼 Original Image of this Document (PDF)
- 2006 WL 819682 (Trial Motion, Memorandum and Affidavit) Plaintiff Ud Technology Corporation's Memorandum of Law in Opposition to Research Corporation Technologies' Motion to Dismiss (Feb. 21, 2006) 🖼 Original Image of this Document (PDF)
- 2006 WL 809228 (Trial Pleading) Answer of Defendant Phenomenex, Inc. (Feb. 6, 2006) 🖼 Original Image of this Document (PDF)
- 2006 WL 809229 (Trial Motion, Memorandum and Affidavit) Defendant Phenomenex, Inc.'s Opening Brief in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State A Claim upon which Relief Can be Granted (Feb. 6, 2006) 🖼 Original Image of this Document (PDF)
- 1:05cv00842 (Docket) (Dec. 5, 2005)
- 2005 WL 4668346 (Trial Pleading) Amended Complaint (Dec. 2005) 🖼 Original Image of this Document (PDF)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REPORTER IMAGE    QUICK PRINT    PRINT    EMAIL    DOWNLOAD    OTHER

c

**Smith v. Delaware First Federal Credit Union**
395 F.Supp.2d 127
D.Del.,2005.
October 25, 2005 (Approx. 5 pages)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 29, 2007 two copies of the

foregoing **OPENING BRIEF OF CHRISTY MANAGEMENT LLC IN SUPPORT OF ITS**

**MOTION TO DISMISS** were served by first class mail, postage prepaid, upon the following:

Richard Snyder
P.O. Box 374
Davidsonville, MD 21035

and

Richard Snyder
23 Harbor Road
Rehoboth, DE 19971

_____/s/ John H. Newcomer, Jr._____
John H. Newcomer, Jr.

1544785/1